Case No. 13-2091 (Consol. 13-2133, 13-2162, 13-2202)

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

KENT EUBANK, *et al.,*
*Plaintiffs-Appellants*
and
DR. LEONARD E. SALTZMAN, *et al.,*
*Plaintiffs-Appellees*

v.

PELLA CORPORATION, *an Iowa corporation, et al.,*
*Defendants-Appellees*
Appeals of: BRADLEY SCHULTZ and MICHAEL SCHULTZ,
*Objecting Class Members*

---

Appeal from The United States District Court
For the Northern District of Illinois, Case No. 1:06-CV-4481
The Honorable Judge James B. Zagel

---

### BRIEF OF PLAINTIFFS-APPELLEES
### DR. LEONARD E. SALTZMAN, TIM BASTIAANSE, JOSEPH PALMIOTTO,
### BRAD ZURN, AND JUDITH MCCLOSKY

---

Richard J. Burke
Paul M. Weiss
Jeffrey A. Leon
COMPLEX LITIGATION GROUP LLC
513 Central Ave., Suite 300
Highland Park, Illinois 60035
(847) 433-4500

Jonathan Shub
SEEGER WEISS LLP
1515 Market St., Suite 1380
Philadelphia, Pennsylvania 19102
(215) 564-2300

Steven R. Jaffe
Mark Fistos
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Ave., Suite 2
Ft. Lauderdale, Florida 33301
(954) 524-2820

Ben Schwartzman
ANDERSEN BANDUCCI PLLC
101 S. Capitol Blvd., Suite 1600
Boise, Idaho 83702
(208) 342-4411

*Attorneys for Plaintiffs-Appellees and Settlement Class*

**CIRCUIT RULE 26.1    DISCLOSURE STATEMENT**

Appellate Court No: 13-2091

Short Caption: Eubank, et al. and Saltzman, et al. v. Pella Corporation, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    **[  ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Dr. Leonard E. Saltzman; Tim Bastiaanse; Joseph Palmiotto; Brad Zurn; Judith McClosky

 

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Complex Litigation Group LLC (f/k/a Freed & Weiss LLC); Seeger Weiss LLP;

Farmer, Jaffe, Weissing, Edwards, Fistos & Lehrman, P.L.; Andersen Banducci PLLC;

James, Hoyer, Newcomer & Smiljanich, P.A.; Rothstein Rosenfeldt & Adler, P.A.

(3)    If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

---

Attorney's Signature: s/ Richard J. Burke    Date: September 10, 2013

Attorney's Printed Name: Richard J. Burke

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes**  X  **No** _____

Address: Complex Litigation Group LLC, 513 Central Ave., Suite 300, Highland Park, IL 60035

Phone Number: 847-433-4500    Fax Number: 847-433-2500

E-Mail Address: richard@complexlitgroup.com

rev. 01/08 AK

**CIRCUIT RULE 26.1    DISCLOSURE STATEMENT**

Appellate Court No: <u>13-2091</u>

Short Caption: <u>Eubank, et al. and Saltzman, et al. v. Pella Corporation, et al.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    **[  ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    <u>Dr. Leonard E. Saltzman; Tim Bastiaanse; Joseph Palmiotto; Brad Zurn; Judith McClosky</u>

    _____

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    <u>Complex Litigation Group LLC (f/k/a Freed & Weiss LLC); Seeger Weiss LLP;</u>

    <u>Farmer, Jaffe, Weissing, Edwards, Fistos & Lehrman, P.L.; Andersen Banducci PLLC;</u>

    <u>James, Hoyer, Newcomer & Smiljanich, P.A.; Rothstein Rosenfeldt & Adler, P.A.</u>

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

Attorney's Signature: <u>s/ Paul M. Weiss</u>    Date: <u>September 10, 2013</u>

Attorney's Printed Name: <u>Paul M. Weiss</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** _____  **No**  X 

Address: <u>Complex Litigation Group LLC, 513 Central Ave., Suite 300, Highland Park, IL 60035</u>

Phone Number: <u>847-433-4500</u>    Fax Number: <u>847-433-2500</u>

E-Mail Address: <u>paul@complexlitgroup.com</u>

rev. 01/08 AK

**CIRCUIT RULE 26.1    DISCLOSURE STATEMENT**

Appellate Court No: 13-2091

Short Caption: Eubank, et al. and Saltzman, et al. v. Pella Corporation, et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    **[   ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Dr. Leonard E. Saltzman; Tim Bastiaanse; Joseph Palmiotto; Brad Zurn; Judith McClosky

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Complex Litigation Group LLC (f/k/a Freed & Weiss LLC); Seeger Weiss LLP;

Farmer, Jaffe, Weissing, Edwards, Fistos & Lehrman, P.L.; Andersen Banducci PLLC;

James, Hoyer, Newcomer & Smiljanich, P.A.; Rothstein Rosenfeldt & Adler, P.A.

(3)    If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

Attorney's Signature: s/ Jeffrey A. Leon    Date: September 10, 2013

Attorney's Printed Name: Jeffrey A. Leon

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ☒

Address: Complex Litigation Group LLC, 513 Central Ave., Suite 300, Highland Park, IL 60035

Phone Number: 847-433-4500    Fax Number: 847-433-2500

E-Mail Address: jeff@complexlitgroup.com

rev. 01/08 AK

**CIRCUIT RULE 26.1   DISCLOSURE STATEMENT**

Appellate Court No: 13-2091

Short Caption: Eubank, et al. and Saltzman, et al. v. Pella Corporation, et al.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[  ]       PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Dr. Leonard E. Saltzman; Tim Bastiaanse; Joseph Palmiotto; Brad Zurn; Judith McClosky

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Complex Litigation Group LLC (f/k/a Freed & Weiss LLC); Seeger Weiss LLP;

Farmer, Jaffe, Weissing, Edwards, Fistos & Lehrman, P.L.; Andersen Banducci PLLC;

James, Hoyer, Newcomer & Smiljanich, P.A.; Rothstein Rosenfeldt & Adler, P.A.

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

Attorney's Signature:  s/ Jonathan Shub                    Date:  September 10, 2013

Attorney's Printed Name:  Jonathan Shub

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ⊠

Address:  Seeger Weiss LLP, 1515 Market St., Suite 1380, Philadelphia, PA 19102

Phone Number:  215-564-2300                    Fax Number:  215-851-8029

E-Mail Address:  jshub@seegerweiss.com

rev. 01/08 AK

**CIRCUIT RULE 26.1   DISCLOSURE STATEMENT**

Appellate Court No: 13-2091

Short Caption: Eubank, et al. and Saltzman, et al. v. Pella Corporation, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   [   ]       **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Dr. Leonard E. Saltzman; Tim Bastiaanse; Joseph Palmiotto; Brad Zurn; Judith McClosky

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Complex Litigation Group LLC (f/k/a Freed & Weiss LLC); Seeger Weiss LLP;

Farmer, Jaffe, Weissing, Edwards, Fistos & Lehrman, P.L.; Andersen Banducci PLLC;

James, Hoyer, Newcomer & Smiljanich, P.A.; Rothstein Rosenfeldt & Adler, P.A.

(3)   If the party or amicus is a corporation:

i)   Identify all its parent corporations, if any; and

ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

Attorney's Signature:  s/ Steven R. Jaffe                          Date:  September 10, 2013

Attorney's Printed Name:  Steven R. Jaffe

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** ☒

Address:  Farmer, Jaffe, Weissing, Edwards, Fistos & Lehrman, P.L., 425 N. Andrews Ave., Suite 2,

Fort Lauderdale, FL 33301

Phone Number:  954-524-2820                    Fax Number:  954-524-2822

E-Mail Address:  steve@pathtojustice.com

rev. 01/08 AK

**CIRCUIT RULE 26.1   DISCLOSURE STATEMENT**

Appellate Court No: ___13-2091_____

Short Caption: __Eubank, et al. and Saltzman, et al. v. Pella Corporation, et al._____

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   **[   ]      PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED
            AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   __Dr. Leonard E. Saltzman; Tim Bastiaanse; Joseph Palmiotto; Brad Zurn; Judith McClosky_____

   _____

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   __Complex Litigation Group LLC (f/k/a Freed & Weiss LLC); Seeger Weiss LLP;_____

   __Farmer, Jaffe, Weissing, Edwards, Fistos & Lehrman, P.L.; Andersen Banducci PLLC;_____

   __James, Hoyer, Newcomer & Smiljanich, P.A.; Rothstein Rosenfeldt & Adler, P.A._____

(3)   If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and

   _____

   ii)   list any publicly held company that owns 10% or more of the party's or amicus' stock:

   _____

Attorney's Signature: __s/ Mark Fistos_____      Date: __September 10, 2013_____

Attorney's Printed Name: __Mark Fistos_____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** __✕__

Address: __Farmer, Jaffe, Weissing, Edwards, Fistos & Lehrman, P.L., 425 N. Andrews Ave., Suite 2,_____

   __Fort Lauderdale, FL 33301_____

Phone Number: __954-524-2820_____      Fax Number: __954-524-2822_____

E-Mail Address: __mark@pathtojustice.com_____

rev. 01/08 AK

**CIRCUIT RULE 26.1   DISCLOSURE STATEMENT**

Appellate Court No: 13-2091

Short Caption: Eubank, et al. and Saltzman, et al. v. Pella Corporation, et al.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   [  ]      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Dr. Leonard E. Saltzman; Tim Bastiaanse; Joseph Palmiotto; Brad Zurn; Judith McClosky

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Complex Litigation Group LLC (f/k/a Freed & Weiss LLC); Seeger Weiss LLP;

Farmer, Jaffe, Weissing, Edwards, Fistos & Lehrman, P.L.; Andersen Banducci PLLC;

James, Hoyer, Newcomer & Smiljanich, P.A.; Rothstein Rosenfeldt & Adler, P.A.

(3)   If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and

   ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

Attorney's Signature: s/ Ben Schwartzman          Date: September 10, 2013

Attorney's Printed Name: Ben Schwartzman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _____   **No** __☒__

Address: Andersen Banducci PLLC, 101 S. Capitol Blvd., Suite 1600, Boise, ID 83702

Phone Number: 208-342-4411          Fax Number: 208-342-4455

E-Mail Address: bas@andersenbanducci.com

rev. 01/08 AK

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ................................................................ 1

STATEMENT OF FACTS ............................................................................ 1

A.   Factual Background .......................................................................... 1

B.   The Certified Classes ....................................................................... 2

C.   Settlement Negotiations ................................................................... 3

D.   Terms of the Settlement ................................................................... 4

E.   The Settlement Approval Process ..................................................... 4

SUMMARY OF THE ARGUMENT .......................................................... 6

ARGUMENT ............................................................................................. 11

I.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING
      THAT THE SETTLEMENT MEETS EACH OF THE *ISBY* FACTORS
      GOVERNING FINAL APPROVAL OF CLASS ACTION SETTLEMENTS ..... 11

A.   The Strength of Plaintiffs' Case Measured Against the Settlement Valued at Over $90 Million
     Supported Final Approval of the Settlement, And Appellants Vastly Overvalue the Potential
     Benefit to the Class From Proceeding Through a Common Liability Trial and Individual
     Damages Trial, and Understate the Risks that Class Members Face Along the Way. ........... 12
     1.   Class Counsel Independently Valued the Settlement at $90 Million Compared to a Value of
          Zero That Could Have Been Obtained Through a Trial. ................................................ 13
     2.   Objectors Misunderstand the Benefits of the Settlement. ............................................. 18
     3.   The Settlement Compares Favorably to Other Windows Class Action Settlements. ........... 21

B.   The Amount of Opposition to the Settlement Was Minuscule, Supporting Final Approval of the
     Settlement. ...................................................................................................................... 21

C.   The District Court Did Not Abuse Its Discretion in Finding that the Settlement Was Bereft of
     Collusion or Conflicts of Interest. .................................................................................... 22
     1.   The Settlement Process Was Free of Collusion. ......................................................... 23
     2.   There is Nothing About the Attorneys' Fees Here Which Suggests Collusion. .................. 24
     3.   The Settlement Creates No Conflict Among Class Members. ......................................... 25
     4.   There Is No Conflict of Interest Created By Differences In State Consumer Fraud Laws. .. 27
     5.   The District Court Did Not Abuse Its Discretion in Finding That Class Representative
          Saltzman Is Adequate Under Rule 23. .................................................................... 29
          a.   The District Court Did Not Abuse Its Discretion in Finding Dr. Saltzman To Be an
               Adequate Class Representative Under the Case-by-Case Standard Enunciated in *Susman*.

........................................................................................................... 29

    b.    The Presence of Other Class Representatives Makes Dr. Saltzman's Adequacy Immaterial.

    ........................................................................................................... 32

   6.   Class Counsel Meet the Requirements for Adequacy And Has No Conflicts of Interest. ..... 33

   7.   The Class Representative Fees Here Were Modest and Reasonable In Light of the Services
    Performed. ........................................................................................................... 35

   8.   The "Clear Sailing" Provision In the Settlement Is Not An Indication of Collusion. ............ 37

D.   The Stage of the Proceedings and Amount of Discovery Completed When Settlement was
    Achieved........................................................................................................... 38

**II.   THE DISTRICT COURT'S AWARD OF ATTORNEYS' FEES WAS NOT AN
    ABUSE OF DISCRETION. ................................................................................39**

A.   The District Court's Attorneys' Fee Award Was Within Its Discretion Under the Common
    Benefit Approach. ........................................................................................................... 39

   1.   The Attorneys' Fees Are Low in Comparison to the Benefit. .......................................... 39

   2.   The Court Was Within Its Discretion to Award Fees Based on the Valuation and Not to Use
    Claims Filed as the Valuation Basis. ........................................................................... 40

B.   The District Court Did Not Abuse its Discretion Even if the Fee Award Was Judged Under the
    Lodestar Method........................................................................................................... 43

C.   Class Counsel's Request For Attorneys' Fees Compares Favorably With Other Home Product
    Settlements........................................................................................................... 44

D.   Other Considerations Support the District Court's Discretion in Awarding the Attorneys Fees.
    ........................................................................................................... 45

E.   The "Kickforward" Is Not Only a Common Feature of Class Settlements, it is Beneficial to the
    Class, And It Has Not Been Exercised. ........................................................................... 46

**CONCLUSION ................................................................................................48**

**CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ..........................................50**

**CERTIFICATE OF SERVICE ................................................................................51**

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Allen v. Holiday Universal*, 249 F.R.D. 166, 182 (E.D. Pa. 2008)............................. 27

*Bert v. AK Steel Corp.*, 2008 WL 4693747 (S.D. Ohio Oct. 23, 2008)........................ 24

*Brown v. LaSalle Northwest Nat'l Bank*, 1993 WL 313563 (N.D. Ill. Aug. 17, 1993) ........................................................................................................................... 33

*Calabrese v. CSC Holdings, Inc.*, 2009 WL 425879 (E.D.N.Y. Feb. 19, 2009) ......... 33

*Carson v. American Brands, Inc.*, 450 U.S. 79 (1981) .............................................. 11

*Center for Individual Freedom v. Madigan*, 697 F.3d 464 (7th Cir. 2012)................. 1

*Charron v. Pinnacle Group N.Y. LLC*, No. 07-6313, 2012 WL 2053530 (S.D.N.Y. June 6, 2012) .................................................................................................. 8, 21

*City of Burlington v. Dague*, 505 U.S. 557 (1992) .................................................... 44

*Cruz v. Hook-Superx, LLC*, 09 CIV. 7717, 2010 WL 3069558 (Aug. 5, 2010) .......... 46

*EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884 (7th Cir. 1985) ....................... 12

*Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872 (7th Cir. 2012) ......................... 36

*Fischer v. ITT Corp.*, 72 F.R.D. 170 (E.D.N.Y. 1976) .............................................. 30

*Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560 (7th Cir. 1994) ............................. 44

*Florin v. NationsBank of Ga., N.A.*, 60 F.3d 1245, (7th Cir. 1995) ("*Florin II*") ....... 39

*Galanti v. The Goodyear Tire & Rubber Co.*, No. 03-209 (D.N.J. Nov. 17, 2004) ..... 45

*General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074 (7th Cir. 1997) ........................................................................................................................... 12

*Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417, 431 (4th Cir. 2003) ............... 26

*Hartless v. Clorox Co.*, 273 F.R.D. 630 (S.D. Cal. 2011) ........................................ 38

*Humphrey v. Int'l Paper, Inc.*, 2003 WL 22111093 (N.D. Ill. Sept. 11, 2003).......... 33

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531 (N.D. Cal. 2012)... 10

*In re Cenco, Inc. Sec. Litig.*, 519 F. Supp. 322 (N.D. Ill. 1981) ................................ 43

*In re Cendant Corp. Secs. Litig.*, 109 F. Supp. 2d 235 (D.N.J. 2000) ....................... 38

*In re Dry Max Pampers Litigation*, 2013 WL 3957060 (6th Cir. Aug. 2, 2013)........ 36

*In re Kentucky Grilled Chicken Coupon Marketing & Sales Practices Litigation*, 280 F.R.D. 364 (N.D. Il. 2010) ............................................................................... 41

*In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1021 (N.D. Ill. 2000)..... 22

*In re Oil Spill by Oil Rig Deepwater Horizon*, 2013 WL 144042 (E.D. La. Jan. 11, 2013) .................................................................................................................. 38

*In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 349 (3d Cir. 2010) ....................... 26

*In re RJR Nabisco, Inc. Secs. Litig.*, Nos. 1992 U.S. Dist. LEXIS 12702 (S.D.N.Y. Aug. 24, 1992)................................................................................................... 38

*In re Uponor, Inc.*, 2013 WL 2450138 (8th Cir. June 7, 2013).................................. 27

*In re Vitamins Antitrust Litig.*, MISC. 99-197(TFH), 2001 WL 34312839 (D.D.C. July 16, 2001) ................................................................................................... 42

*In re Yasmin and Yaz Marketing Litigation*, 2012 W.L. 865041 (S.D. Ill. March 13, 2012) .................................................................................................................. 29

*In re Zurn Pex Plumbing Products Liab. Litig.*, 644 F.3d 604 (2011) ....................... 46

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996) .................................................. 11, 12, 13

*Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241 (8th Cir. 1996) ............................ 42

*Lewis v. Goldsmith,* 95 F.R.D. 15 (D.N.J. 1982).................................................. 30

*Local Joint Exec. Bd. Of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.,* 244 F.3d 1152 (9th Cir. 2001) ................................................................... 33

*Malchman v. Davis,* 761 F.2d 893 (2d Cir.1985) *cert. denied,* ⸺ U.S. ⸺, (1986) ................................................................................................................ 30

*Mangone v. First USA Bank*, 206 F.R.D. 222 (S.D. Ill. 2001).................................... 42

*Mars Steel v. Continental Ill. Nat'l Bank & Trust*, 834 F.2d 677 (7th Cir. 1987) .... 23

*Marshall v. H & R Block Tax Services Inc.*, 270 F.R.D. 400 (S.D. Ill. 2010)............. 46

*Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423 (2d Cir. 2007) ................ 41

*McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806 (E.D. Wis. 2009). 38, 41

*Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010)........................................ 7, 13

*Perdue v. Kenny A.*, – U.S. –, 130 S. Ct. 1662 (2010)................................................ 43

*Physicians of Winter Haven LLC v. Steris Corp.*, 1:10 CV 264, 2012 WL 406966 (N.D. Ohio Feb. 6, 2012)............................................................................. 42

*Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157 (9th Cir. 2013)...................... 37

*Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002) ...................... 13, 26

*Saltzman v. ESBI*, 348 Ill. App. 3d 740 (Ill. App. Ct. 2004)...................................... 31

*Sierra Club v. EPA*, 292 F.3d 895 (D.C.Cir.2002) ........................................................ 1

*Smith v. Sprint Communications Co., L.P.,* 387 F.3d 612 (7th Cir. 2004) ........... 26, 27

*Sobel v. Hertz Corp.*, ⸱⸱F.R.D.⸱⸱, 2013 WL 1182209 (D. Nev. March 21, 2013) ........ 33

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) .................................................. 42

*Susman v. Lincoln Am. Corp.*, 561 F.2d 86 (7th Cir. 1977) ...................................... 29

*Taubenfeld v. AON Corp.*, 415 F.3d 597 (7th Cir. 2005).................................... 40, 44

*Uhl v. Thoroughbred Tech. and Telecomm., Inc.*, 309 F.3d 978 (7th Cir. 2002)....... 18

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) ..................................................................................................... 26

*Vaughn v. Am. Honda Motor Co., Inc.*, 507 F.3d 295, 300 (5th Cir. 2007)............... 48

*Williams v. MGM–Pathe Commun. Co,* 129 F.3d 1026 (9th Cir. 1997) ................... 41

*Woodard v. Andrus*, 272 F.R.D. 185 (W.D. La. 2010)................................................ 46

## OTHER AUTHORITIES

Fitzpatrick, The End of Objector Blackmail?, 62 Vanderbilt L. Rev. 1623, 1643 (2008) .......................................................................................................... 48

## JURISDICTIONAL STATEMENT

No Appellant addressed their standing to appeal in their Jurisdictional Statement[1] despite the fact that "standing is a jurisdictional requirement" (*Center for Individual Freedom v. Madigan*, 697 F.3d 464, 473 (7th Cir. 2012)) and despite the requirement that "[i]n its opening brief, the petitioner should also include in the 'Jurisdictional Statement' a concise recitation of the basis upon which it claims standing." *Sierra Club v. EPA,* 292 F.3d 895, 900-01 (D.C. Cir. 2002).  For the reasons stated in Appellees' separately filed Motion to Dismiss For Lack of Standing (App. D.E. 32), no Appellant has standing to file these appeals, and as this Court lacks jurisdiction, these appeals should be dismissed.

## STATEMENT OF FACTS

### A.  Factual Background

This Settlement resolves claims related solely to certain of Pella's ProLine Windows, which have been nationally sold since 1991 through Pella-branded stores and major retail chains.

Plaintiffs below alleged that Pella ProLine Windows were manufactured with an inherent design defect that can cause water damage to interior wood components, as well as potential damage to other property surrounding the window including the frame and structure.  (R. 127-28.)  The defect is alleged to be latent as the aluminum cladding masks the rot so that it is commonly not apparent to consumers until several years of progressive deterioration, often after the warranty

---

[1] Appellant Schulz summarily claimed, incorrectly, that he is a "class-member and objector to settlement approval, [who] has standing to appeal."  (App. D.E. 26 at 2.)

has expired.  *Id.*

Plaintiffs further alleged that Pella knew or should have known about the defect, and should have disclosed it to customers.  There was evidence that by 2006 (R. 129-30) wood deterioration became so pervasive that Pella's distributors complained loudly about excessive warranty costs.  (R. 4549.)  Pella actually projected a 14% failure rate.[2]  (*Id.*)  In response to the dealer complaints, Pella developed an undisclosed ProLine Service Enhancement Program ("PSEP") to reimburse distributors for their costs associated with honoring Pella's warranties, including enhanced reimbursements for installation and finishing that exceeded the warranty obligation of product repair or replacement.  Pella did not inform customers of the availability of PSEP benefits.  (R. 2911.)

### B.  The Certified Classes

On June 4, 2009, the District Court granted, in part, Plaintiffs' Motion Class Certification Motion, certifying a six-state FRCP 23(b)(3) class limited to liability[3], and a 50-state FRCP 23(b)(2) declaratory judgment class for Class members whose windows did not yet manifest the alleged defect, or had manifest wood rot but the window had not been repaired or replaced.  (R. 2940.)  Had this case proceeded to trial, this class potentially would have been entitled to six declarations including declarations that all Pella ProLine Windows contain a defect and that the PSEP is a

---

[2] In litigation Pella contested the actual failure rate, and it is an issue that would have been the subject of significant litigation going forward.

[3] The 23(b)(3) class comprised persons in Illinois, California, Florida, Michigan, New Jersey, and New York who had already paid to replace defective windows.  The issues of causation, damages, and statute of limitations were expressly excluded from the certification order.

warranty modification. (R. 2911-40.) This certification order was affirmed by this Court in an opinion dated May 20, 2010, stating that the "central questions in the litigation are ... whether the ProLine windows suffer from an inherent defect ... whether and when Pella knew of this defect, the scope of Pella's warranty, and the nature of the[PSEP] and whether it amended the warranty." *Saltzman,* 606 F.3d at 394. This Court acknowledged that "class members still must prove individual issues of causation and damages" in subsequent proceedings, but that those subsequent proceedings would be relieved of "potentially expensive expert testimony and proof that would cost considerably more to litigate than the claims would be worth to the plaintiffs." *Id.*

### C. Settlement Negotiations

The Settlement challenged here resulted from multiple mediation sessions and in-person meetings over the course of more than a year. Shortly after the Supreme Court denied Pella's certiorari petition, the parties began to discuss potential settlement structures. The parties retained a mediator, retired Judge Richard Solum, in May 2011 to assist them. (R. 5369-70.) Over the course of the next seven months the parties negotiated in person, through conference calls, and through numerous emails, and ultimately reached a mediated settlement of the class benefit. (R. 4046-47.) Several months after agreeing on the term sheet, the parties met with a second mediator, Judge Erwin Katz, to negotiate attorneys' fees and reached a resolution. (R. 5773-74.) From December 2011 through May 2012, the parties worked zealously to finalize all the details of the Settlement Agreement,

which were numerous, culminating in a signed agreement on June 19, 2012.  (R. 4187-4254.)  Both mediators submitted Declarations supportive of the arm's length negotiations conducted.  (*See* R. 5369-70; 5773-74).

### D.  Terms of the Settlement

The Settlement creates this Court's "contemplated process" in which "members may file a claim with Pella for service" but with "issues of causation and damage ... handled individually" (*Saltzman*, 606 F.3d at 394):

- Pella does not dispute the existence of the alleged design defect for Settlement purposes (R. 4194);

- The PSEP benefits become a direct obligation of Pella to all Class members (R. 4197);

- The PSEP is extended to additional vintages, 2004-06 and is enhanced in amount, coverage and duration (*Id.*);

- In addition to the PSEP, a Claims Process can award up to $750 for documented out-of-pocket expenses (R. 4214);

- The Arbitration alternative could award up to $6000  for out-of-pocket expenses upon proof of causation and damages, with arbitration costs paid by Pella (*Id.*);

- Benefits are available to past, current and future owners of all structures that have Pella ProLine Windows up to 15 years from date of manufacture (the certified liability class, in contrast, only included original purchasers) (R. 4194); and

- Class benefits remain available until 2021.  (R. 4238.)

### E.  The Settlement Approval Process

Plaintiffs and Pella jointly moved for preliminary approval on June 19, 2012 (R. 4175-4336).  While it is rare for a class action settlement to be attacked even before the preliminary approval stage, George Lang and his Group of objectors did

4

just that, filing a FRCP 23(g) motion to remove CLG as Class Counsel and Dr. Saltzman as Class Representative and to replace CLG with Mr. Lang, and they opposed almost every material term of the yet-to-be signed settlement, including its notice provisions. (R. 3842-4041; 4622-4896.) The District Court held a lengthy evidentiary hearing on this motion, with Lang testifying for five hours on direct examination where he laid out his (libelous) allegations. Judge Zagel halted the hearing and denied the motion before Class Counsel even had the opportunity to cross-examine Mr. Lang. (*See* transcript attached hereto as SA001-170.)

As nearly all of the more scurrilous allegations were based solely on Mr. Lang's word, it is notable that Judge Zagel told Mr. Lang on the record that "it's quite clear you spoke out of an absence of knowledge" in his attacks on the sufficiency of the settlement terms and process. (SA163-64.) This factual conclusion and credibility determination is entitled to deference. There was extensive additional briefing on all objections which are now the subject of preliminary and final approval phases, and Judge Zagel considered and rejected them all. (R. 6434-36.)

Final approval was granted by the District Court on April 24, 2013, with all objections rejected by Judge Zagel who explained that he had a "long period presiding over this case ... [and] acquired a great deal of knowledge of the subject matter, the variety of possible remedies, and the suitability of class treatment." (R. 6434.). Judge Zagel found the Settlement provided an "appropriate, adequate and efficient means to repair the damage done, both current and future" and in

5

particular that the "structure for resolution is ... satisfactory and efficient without legal costs imposed upon claimants." (R. 6434-35.) The court found that the satisfaction of the class was manifest "in the scant number of individual objections"; and that "by virtue of the settlement, defendant will not only resolve actual damages." (*Id.*) The potential weakness of Plaintiffs' claims were considered and balanced against the fact that the Settlement did not impose an absolute maximum in compensation, "something of significant value to the class." (R. 6435.) From the entire record, Judge Zagel concluded that the settlement is "fair, adequate and reasonable, and not the product of collusion." (R. 6435.)

In the District Court's fee award, Judge Zagel again reiterated the significant complexity of the litigation citing both the district court's class certification order, and this Court affirmance, as well as his consideration of the "independently determined value of the settlement of the Class of $90 million." (R. 6439.) The District Court's orders evidence that the requisite inquiry was made under Fed. R. Civ. P. 23(e).

## SUMMARY OF THE ARGUMENT

This brief addresses the consolidated appeals of five objectors to a Settlement in a certified class action involving allegations of defects in Pella ProLine windows. This Court previously affirmed, on a FRCP 23(f) appeal, the District Court's certification of a six-state FRCP 23(b)(3) class limited to the determination of liability and a 50 state 23(b)(2) class that would have declared the class' warranty rights with respect to the alleged product defect. *Pella Corp. v. Saltzman*, 606 F.3d

391 (7th Cir. 2010). In affirming, this Court stated that the intended "cumulative effect" of a trial on the issues certified by the District Court would be "[t]he contemplated process in which members may file a claim with Pella for service" and "[i]ssues of causation and damage issues, such as whether the defect caused the damage to a particular window and how much the design contributed to the rot, will be handled individually." *Id.* at 394.

After this Court's affirmance, and the denial of a Petition for *Writ* of *Certiorari*, the parties engaged in a lengthy, professionally mediated effort to craft a settlement consistent with this Court's intentions in affirming the limited certified classes. The resulting Settlement put in place procedures where 23(b)(3) class members could receive up to $750 in a cash payment plus additional warranty benefits or opt into an arbitration process limited to causation and damages where they could receive up to $6000 for their out-of-pocket expenses. The members of the 23(b)(3) class also receive extended and enhanced warranty protection through the year 2021.

Of the 236,000 Class members who received direct notice of the Settlement, only 117 opt outs were received and there were only nine total objectors to the Settlement.[4] This was not a passive class. Class Counsel knows from the Settlement Administrator's data that the Class has reviewed the Settlement. The number of "hits" to the Settlement website exceeded 1.4 million, there were over

---

[4] Of these nine, two were *pro se* objectors who withdrew their objections after speaking with Class Counsel and/or Pella and acknowledged that the Settlement was satisfactory. (R. 5535-36).

13,600 calls received by the Settlement Administrator, and over 30,500 claim forms had been downloaded prior to final approval. (R. 5731-32.)

The Class sees what Appellant Objectors refuse to accept: the Settlement offers clear and certain benefits, especially in comparison to proceeding with a class-wide liability-only trial followed by individual causation and damages trials. The Class members' embrace of the Settlement indicates their understanding of the wisdom of Judge McMahon's reasoned observations in approving the settlement of a class action that similarly had been certified as to liability only:

> The path from this stage of the litigation to a final judgment on the issue of Defendants' liability ... would be long, complicated, and expensive. As this Court has explained: "It could be ten years from now before you get anything if everybody goes after everything that he wants." Notwithstanding the strength of the evidence Plaintiffs elicited during the pre-suit investigation and discovery, additional discovery would be required to establish liability and damages. ... A fact-intensive trial would be necessary, and while the Class Members are sure they will win, they might in fact lose. Preparing and putting on evidence at such a trial would consume tremendous amounts of time and resources and demand substantial judicial resources. Plus, only certain issues would be tried. In particular, damages to the individual Class Members would not be awarded; those would require additional trials, which would be costly and further defer closure. Establishing a mechanism for adjudicating causation and damages will present many of the difficulties that the Claims Administration Process redresses.... Finally, post-trial motions and appeal would delay resolution and increase costs still more.... The entire process will take years.... The Settlement is not, and cannot be, all things to all people. However, I believe that it is fair, reasonable, and adequate to the class as a whole. This is a case where the perfect could easily become the enemy of the good; that would not be in the best interests of the class as a whole. I thus approve the Settlement.

*Charron v. Pinnacle Group N.Y. LLC*, 2012 WL 2053530, at *2 (S.D.N.Y. June 6, 2012). Each one of those observations applies to this case, and all are ignored by

Appellants.

Indeed, Appellants' briefs exhibit a fundamental lack of understanding of the Settlement and the nature of litigating a class action certified solely for a determination of liability and injunctive relief, where the class trial could not, under any scenario, resolve causation or award damages. Appellants thus ignore that without this Settlement and assuming a successful liability trial, each Class member would need to pursue a second trial where they would face a myriad legal perils and the expense of litigation before that Class member could recover. The mistaken understanding of what the Class could achieve from the Class trial infects all aspects of Appellants' arguments, and contrary to Appellants' fanciful imagination of damages resulting from the Class trial possibly totaling as much as $308 million, the actual maximum amount of damages that could be awarded by the District Court from the liability Class trial is exactly $0.

In addition to the sufficiency of the Settlement benefit, the objectors challenge the fairness of the settlement process, despite the unrebutted affidavits of the two retired judges who mediated the Settlement; both who noted the fulsomeness, carefulness, professionalism and complexity of the settlement process. (R. 5369-70; 5773-74.) The Appellants challenge the adequacy of Class Representative Saltzman, and one Class Counsel firm, Complex Litigation Group LLC ("CLG"), through slanderous claims determined by the District Court, following a full blown evidentiary hearing, to be without merit. Further, the Appellants challenge the award of attorneys' fees to be paid Class Counsel, again by

simply ignoring the factual record. The objections were all considered by the District Court in careful and lengthy proceedings, comprising a legal record seven years in the making. The District Court was well within its discretion in approving this Settlement as fair, reasonable and adequate.

These consolidated appeals are also noteworthy for the presence of so-called "professional objectors" John Pentz and Christopher Bandas, who represent two of the Appellants[5]; and the presence of George Lang, a disgruntled former employee of CLG, who, after being terminated for cause, convinced the other three Appellants to discharge CLG and retain Mr. Lang as their counsel. Mr. Lang then used these Appellants to seek removal of CLG as Class Counsel, and his former client, Dr. Saltzman, as a Class Representative. Mr. Lang embarked on this course only after he was terminated, and CLG declined Lang's demand to pay him a $1,100,000 "referral fee" for this very case. (R. 5076.) It is to be noted that Mr. Lang sought removal of Dr. Saltzman and CLG even before the parties had reduced the settlement to a writing. None of the other appointed Class Counsel supported the Lang gambit, and in fact, objected to it.

However questionable the sordid motives of this rogues' gallery of Appellants' counsel may be, the Appellants' arguments are bereft of evidentiary support, legal

---

[5] Mr. Pentz's long history as a professional objector was laid out in detail to the District Court. He went looking for a Class member so he could file an objection here, and he has objected to over 15 class settlements and has been criticized for his misguided advocacy. (R. 5602-03; 5758.) As for Mr. Bandas, one court noted that he "does not [object] to effectuate changes to settlements, but does so for his own personal financial gain ... [and] has been excoriated by Courts for this conduct." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012).

precedent, or an honest assessment of the realities of this litigation, proving only that it is far easier to criticize a settlement than to assume the responsibility of crafting one. Nevertheless, this exemplary Settlement was reached after extensive pre-trial discovery, many years of contested litigation, and after lengthy arm's length negotiation. The District Court found that all of the factors articulated by this Court for final approval were satisfied. Accordingly, these consolidated appeals should be denied and the orders of the District Court should be affirmed.

## ARGUMENT

I. **THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT THE SETTLEMENT MEETS EACH OF THE *ISBY* FACTORS GOVERNING FINAL APPROVAL OF CLASS ACTION SETTLEMENTS**

Rule 23(e) of the Federal Rules of Civil Procedure requires judicial approval of class action settlements, subject to the recognition that "federal courts naturally favor the settlement of class action litigation." *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996). In determining whether a district court should exercise its discretion to approve a class settlement as "fair," the district court should "consider the facts in the light most favorable to the settlement" (*id.* at 1198-99), and a court should "not decide the merits of the case or resolve unsettled legal questions." *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981). Instead, a court's inquiry should be "limited to the consideration of whether the proposed settlement is lawful, fair, reasonable, and adequate." *Isby,* 75 F.3d at 1196. These directives are carried out by considering the "*Isby* Factors," which are the strength of plaintiff's case on the merits measured against the terms of the settlement; the

complexity, length, and expense of continued litigation; the amount of opposition to the settlement; the presence of collusion in gaining a settlement; the stage of the proceedings; and amount of discovery completed. *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082 (7th Cir. 1997). In weighing these factors, district courts have been told to "recognize[] that the first factor, the relative strength of the plaintiffs' case on the merits as compared to what the defendants offer by way of settlement, is the most important consideration." *Isby*, 75 F.3d at 1199. Further, the law recognizes that "[t]he essence of settlement is compromise," and that "the parties to a settlement will not be heard to complain that the relief afforded is substantially less than what they would have received from a successful resolution *after* trial." *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985). Here, the District Court weighed the *Isby* factors and acted within its discretion in approving the settlement.

**A. The Strength of Plaintiffs' Case Measured Against the Settlement Valued at Over $90 Million Supported Final Approval of the Settlement, And Appellants Vastly Overvalue the Potential Benefit to the Class From Proceeding Through a Common Liability Trial and Individual Damages Trial, and Understate the Risks that Class Members Face Along the Way.**

Appellants' briefs claim that the District Court breached its fiduciary duty to the Class by approving the Settlement without having valued it; and/or that the $90 million valuation assigned by the District Court in its order approving Class Counsel's attorneys' fees (R. 6439) was "clearly erroneous"[6] and that the Settlement was insufficient compared to what could have been gained through a trial. These

---

[6] App. D.E. 26 at 23.

arguments are abundantly contradicted by the record.

In this Circuit, a district court should not reject a settlement "solely because [the settlement] does not provide a complete victory to the plaintiffs." *Isby*, 75 F.3d at 1200. Appellants fail to even understand what a "complete victory" would have been given the limited nature of the certified Classes, and they therefore vastly overstate what the value of a fully litigated outcome could have been. No Appellant engaged in a serious analysis of the complexity, length and expense of continued litigation of this case, where a trial on the certified issues would just be a first step on the litigation road for Class members. While Class Counsel believe that they have a strong case on the merits, the Class case is limited by the certification order where "[t]he class jury will be asked to decide only if there was an inherent design defect present in the windows when they left the factory, whether Pella had a duty to disclose the defect, and whether Pella attempted to modify its warranty." *Saltzman*, 606 F.3d at 395. When considered in this light, the Settlement is a complete victory because it resolves all of these issues in favor of the Class for purposes of the pursuit of Settlement benefits.

### 1. Class Counsel Independently Valued the Settlement at $90 Million Compared to a Value of Zero That Could Have Been Obtained Through a Trial.

Plaintiffs-Appellees are mindful of this Court's directive to avoid duplicative briefing. Thus, Pella's brief takes the lead in explaining how the District Court did not abuse its discretion in approving the Settlement based on the analysis required by *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002). At preliminary

approval through final approval the parties and the objectors engaged in repeated briefing on the *Reynolds* analysis to be applied to this Settlement.  (*See* R. 4545, 4622, 4901, 4937, 4942, 5082, 5726, and 5980.)  This briefing included valuations of what the Class could expect following recovery of "net expected litigation value" against the value of the Settlement, together with the probability of success at various stages in what was sure to be a complex litigation process.  To say the least, the *Reynolds* analysis was exhaustive before the District Court.  Pella provided an expert valuation of the "net expected litigation value" and Plaintiffs-Appellees presented a competing settlement valuation of $90 million.  (R. 5751). For its part, the Lang Objectors provided their *Reynolds* evaluation as well.  The components of these valuations were primarily driven by the varying assessment of the number of windows likely to fail, when in their lifetime they were likely to fail (windows like people are sure to fail eventually), and the damages likely to arise from failure.  But for the Lang Objectors, who provided no expert analysis, the valuations of Pella and Appellees were disparate because each took a different view of the "failure rate" occasioned by the defect even though both analyzed the same data of 147,000 known failures.  No data supported the Lang Objectors' position that 100% of the Pella windows would fail, and no data supported their position that each failure would require the installation of an entirely new window and frame.  Because the Lang Objectors operated from these completely unsubstantiated, ergo irrational, assumptions, they concluded that the net litigation value was $3,500,000,000 (although they now claim the net value is *only* $308,000,000, again without any

rationale).  In their Brief to this Court, Pella claims the net litigation value to be

$14.5 million and the Settlement value at $17-28 million.  Pella reaches these

numbers because that was the position it took based upon its own, rather than

Class Plaintiffs-Appellees', analysis of the data.  That Pella and Class Plaintiffs

have a different view of what the data reveals is hardly surprising, but it is not

material to the appeal because *Reynolds* does not require precision, only rational

judgment of possible value ranges.  But they must be rational.  Both Class Plaintiffs

and Pella did expert analyses of 147,000 known window failures.  This data

included when the windows failed, what part of the window failed, and regression

was concluded by both Pella and Class Plaintiffs before the Settlement was

concluded, and those varying views were provided to the District Court.  The

valuations were disparate but at least they were carefully and expertly done, from a

large, verifiable data set and employing standard regression analysis.  The Lang

Objectors provided to the District Court and to this Court a valuation analysis that

simply is devoid of any rational basis or expert analysis.  At the end of the day, the

District Court accepted that the value of the Settlement was $90 million (R. 6438-

39) but even assuming the Appellants current net litigation value of $308 million, or

Pella's value at $28 million (R. 5989), the value of the settlement clearly outweighs

continued litigation.

    In order to understand why the District Court did not abuse its discretion in

adopting Class Plaintiffs' valuation, it is necessary to understand the methodologies

of the valuations.  Class Plaintiffs' valuation, created by professional experts in

15

accounting and statistics, accounted for the following facts:

- monetary damages under the Settlement are only recoverable for manifestation of the defect and not every window has or will manifest the defect and, a defect rate of 13% was derived from the statistical regression of 147,000 "Returns & Allowances" occurrences recorded in internal Pella (R. 5821; 5823);

- Class Plaintiffs regression analysis regressed only a subset of the R&A data reflecting those occurrences with the highest failure rates and most complete data (R. 5821); and

- the windows that did "fail" most frequently failed in the sash component of the window, and not the entire window frame, where the defect was alleged to exist (*i.e.*, the wooden component that prematurely rots due to water exposure). Data on replacement "parts" for warranty failures showed a ratio of sash replacements compared to entire frame replacement of 80/20 (R. 5820; 5840.)

Appellants point to no error in the expert analysis, and that analysis, when applied to a conservative 13% failure rate that Appellants failed to dispute, leads to an aggregate benefit to Settlement Class Members of approximately $90 million. Pella's valuation presented to the District Court assumed a much lower failure rate of 6.5% (R. 5988-90) and also attempted to project a claims rate, which Plaintiffs believe to be inappropriate. *See* Section II.A.2 *infra*.

Pella's valuation analysis presented to this Court in its Brief uses actual claims rates for the damages claims, and then extrapolates these damages claims rates to measure the future warranty claims rates. Plaintiffs do not believe this is the correct analysis because it assumes that the number of claims filed equals the number of window failures. First, there is no argument that the District Court abused its discretion by extrapolating a valuation and not waiting for actual claims

rates. Indeed, the law as discussed in Section II.A.2 makes clear that the District Court's approach was appropriate. Second, a claims rate is not the same thing as a failure rate, but at best only a lower boundary. The failure to file a claim for their damages does not mean that the window did not, nor will not manifest a defect. As this Court knows, there are a wide variety of reasons why class members do not file claims for funds to which they are otherwise entitled. Finally, the rate at which people filed claims for compensation for windows that in many cases were long-ago replaced is not a proxy for what the future claims rate will be for Class members who seek warranty service under the Settlement's extended warranty and enhanced PSEP provisions. In short, the District Court hardly abused its discretion in adopting a valuation that assumed a 13% failure rate as it was independently derived from data of known window failures, by an expert skilled in such analysis. But even with all of these errors, Pella is nonetheless correct that even its lower valuation supports the Settlement under *Reynolds*, and, as will be shown in Section II, Class Counsel's awarded attorneys' fees.

In comparison to this $90 million independent valuation of the Settlement, a trial of the certified claims here, even with a complete victory, would result in an award of $0. The follow-on causation-damages proceedings also have their own probabilities of success and failure and under every valuation presented to the District Court and this Court, the comparison satisfies the *Reynolds* analysis.[7]

---

[7] Even if Appellants are correct that the value of hypothetical individual trials is properly part of the *Reynolds* analysis, Appellants engaged no expert of their own and instead posited a flawed maximum value calculation that is addressed in Pella's

### 2. Objectors Misunderstand the Benefits of the Settlement.

Appellants challenge numerous specific aspects of the Settlement as being "unfair." Appellants are not only wrong, but they ignore that a Settlement is the product of compromise, and that the process of compromise here was detailed and at arm's length. Indeed, Appellants effort to nit-pick the Settlement to death is in contravention of Appellants' legal burden on appeal, as an appellant objector "must do more than just argue that she would have preferred a different settlement structure, as this Court's review of the settlement structure is even narrower. We will reject the district court's decision to approve it only if we find an abuse of discretion." *Uhl v. Thoroughbred Tech. and Telecomm., Inc.*, 309 F.3d 978, 986 (7th Cir. 2002). Because Appellants only argue that they would prefer a different settlement structure, their appeals fail.

Appellants also misunderstand the nature of the Class benefit, which for most claimants is in addition to, not instead of, the existing benefits under Pella's product warranty and the additional benefits provided by the PSEP. Appellants fail to understand that, but/for the Settlement, Pella has no existing legal obligation to provide any PSEP benefits to any Class member. The Settlement makes the PSEP, for the first time, a direct and enforceable legal obligation of Pella that is retroactively applied. (R. 4197.) The Settlement also extends the existing Pella written warranty to beyond ten years and adds benefits for installation and finishing. (*Id.*) Finally, Appellants ignore that the Settlement expands the size of

brief.

18

the 23(b)(3) Classes by (1) making them nationwide and (2) including former owners, where the certified Class had only included those who currently own the home in which they replaced their windows. All of this is covered in more detail in Pella's brief, which Plaintiffs/Appellees adopt.

Thus, the only question regarding "sufficiency" that is raised by Appellants is whether the money payable under the Settlement is a reasonable compromise of the risks of continued litigation, which includes a risk that, absent settlement, one or more of the certified issues may be decided adversely to the Class. But the Settlement resolves all of the certified issues in the Class' favor in the Claims process, and it does so in exchange for certain monetary caps which compare favorably to other window defect settlements. (*See* Section II.C. *infra*.)

No Appellant denies that this would have been an extremely expensive case to litigate that would take a very long time to reach final resolution which can only occur with more discovery, summary judgment motion practice, possible de-certification motion practice, and trial on liability and likely ensuing appeals, with second phase individual proceedings lengthening the time period and increasing the risk to the Class member. In contrast, the Settlement provides a prompt resolution with meaningful relief that avoids the above litany. Without this Settlement, it would be years – if ever – before any class member would recover any benefit whatsoever, and in the meantime Class Members would have to continue to deal with their rotting windows, or pay out-of- pocket for replacement and repair costs

while hoping such costs could be fully recouped during the ongoing litigation.[8] This factor weighs heavily in favor of final approval.

In addition to disregarding the time value of delay and risk, Appellants uniformly misapprehend the legal landscape following class certification. They argue as if there was a pay-day at the end of a class trial and that Pella had no right to an adjudication of causation and damages. But a win at trial would not determine damages, nor the cause of those damages. The Settlement however establishes an adjudication mechanism for the individual issues in the form of a claims administrator who determines that the claimant is a member of the Class that is eligible for damages and provides cash benefits up to $750. (R. 4214.) For Class members who instead opt for the Arbitration process, a "Special Master" is provided free to the Class member to engage in the adjudication of the claim up to $6000.[9] (*Id.*) The District Court plainly recognized the Settlement resulted from a

---

[8] Because a liability finding would produce no damage award, a successful litigation would not result in a fund from which the cost of notice could be recovered. The Settlement thus relieves the Class of the cost of the individual proceedings and the cost of the Class Notice, a liability borne by those who might prevail through individual litigation. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178-79 (1974)
[9] Contrary to the Lang Group's assertion, Class Counsel and Pella both agree that individual Class members do not need to retain an attorney in the Arbitration Claims process; a fact Judge Zagel agreed with. *See* R. 6802 ("I almost believe, in the context of this case, that they don't need a lawyer for arbitration.") Likewise, the Lang Group's argument that the burden to resolve the certified issue of liability is shifted back to Class members undertaking arbitration ignores the express terms of the Settlement, which provides "[w]hether the ... Windows were 'defective' shall not be admitted, but shall not be disputed by Defendants for purposes only of the arbitration. As such, Settlement Class Members will not have to prove that their ... Windows have a 'defect'." (R. 4236.) Thus, the defect is assumed to exist and Pella has no ability to contest the existence of the defect – a complete victory on the only issue that could have been resolved at a class-wide trial.

balancing of these considerations, stating

> [a]fter a long period of presiding over this case, I acquired a great deal of knowledge of ... the variety of possible remedies, and the suitability of class treatment. ... [A]fter careful consideration of objections, I now find, that the remedies available to class members are an appropriate, adequate and efficient means to repair the damage done, both current and future.
>
> In this case, individual damages may be relatively small. Even substantial damages, for which adequate provisions are made in the settlement, are unlikely to be worth the cost of fully adversarial, conventional litigation. In my view, the structure for resolution of claims will, in the vast majority of cases, be satisfactorily and efficiently resolved without legal costs imposed on claimants.

(R. 6434-35.)

### 3. The Settlement Compares Favorably to Other Windows Class Action Settlements.

Furthermore, the District Court was shown how the Settlement offers far more to the Class than comparable class action settlements involving other windows. (*See* R. 4384-4512.) The Settlement exceeds these others in the combined benefits of potential recovery per window, potential amount of recovery per structure, the inclusion of damage to other property, and the terms of extending benefits beyond the current warranty period. This fact is particularly pertinent because none of these other window settlements started from the position of a certified class limited to liability. *Compare Charron v. Pinnacle Group N.Y. LLC*, 2012 WL 2053530 at *2 (S.D.N.Y. June 6, 2012) (obstacles that remain for a class with an issue-only certification are critically important factor in evaluating a settlement).

### B. The Amount of Opposition to the Settlement Was Minuscule, Supporting Final Approval of the Settlement.

21

There were a miniscule number of objections to the Settlement (nine total, two of which were withdrawn) and just 117 potential Class members opted-out out of a direct mail universe of 236,000 (a .000038% objection rate). Unlike a passive notice regime, here actual Class interest can be measured, with over 1.4 million hits to the website, 30,500 forms downloaded, and 13,600 calls to the Settlement Administrator so far. Thus, using the number of Class members as a metric, there has been almost no opposition to the Settlement. *See In re AT& T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 961 (N.D. Ill. 2011) ("[I]t is illuminative that only a tiny fraction of the Class Members saw fit to opt out or to object."); *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1021 (N.D. Ill. 2000) (the fact that "99.9% of class members have neither opted out nor filed objections ... is strong circumstantial evidence in favor of the settlements"), *aff'd*, 267 F.3d 743 (7th Cir. 2001). The District Court thus did not abuse its discretion in putting particular emphasis on the fact that "[t]he general satisfaction of the class is manifest in the scant number of individual objectors." (R. 6435.) This is particularly so when those who did object – the "professional objectors" and the Lang Objectors (Lang himself has sued CLG in state court seeking a referral fee of $1.1 million (R.5076)) – do not come to the process with clean hands. (*See supra* at 4-6.)

### C. The District Court Did Not Abuse Its Discretion in Finding that the Settlement Was Bereft of Collusion or Conflicts of Interest.

Appellants have made extraordinarily harsh allegations against Class Counsel CLG and Plaintiff Saltzman in their effort to claim that a settlement mediated by two respected former jurists over the course of more than a year involving extensive negotiations by multiple firms representing the Class, was in fact the product of collusion. Many of the sensational allegations are beneath the dignity of this Court. The District Court however conducted an evidentiary hearing and found the testimony so devoid of credibility that the motion to displace Class Counsel and Dr. Saltzman was denied without even the need for the sole witness, Mr. Lang, to be cross-examined. The District Court exercised the opportunity to evaluate the credibility of the sole accuser, George Lang, and found him wanting, concluding, "after careful consideration," the settlement was "not a product of collusion." (*Id.*) This conclusion, especially in light of credibility determinations, was not an abuse of discretion given the general proposition that a district court should presume that a settlement was reached without collusion in the absence of evidence to the contrary. *Mars Steel v. Continental Ill. Nat'l Bank & Trust*, 834 F.2d 677, 681-82 (7th Cir. 1987); *Armstrong*, 616 F.2d at 325. There is no *evidence* of collusion. There are only Appellant's insinuations.

### 1. The Settlement Process Was Free of Collusion.

No Appellant questions the Settlement process, which itself undercuts any claim of collusion here. Settlement discussions began only after six years of litigation and were only concluded after protracted and often spirited arm's length negotiation. This negotiation was not some cocktail napkin settlement worked out

over lunch. The negotiations lasted eleven months with numerous exchanges of proposals and the analysis of 147,032 wood defect claims from 1993 until 2011, by year, type of claim, and distributorship, and it included reasoned analysis of over 10,000 documents and the examination of numerous witnesses and experts. (R. 5331-44.) All of this took place under the supervision of two different mediators. *See Bert v. AK Steel Corp.*, 2008 WL 4693747, at *2 (S.D. Ohio Oct. 23, 2008) ("The participation of an independent mediator in settlement negotiations virtually insures that the negotiations were conducted at arm's length and without collusion between the parties.") (citations omitted).

### 2. There is Nothing About the Attorneys' Fees Here Which Suggests Collusion.

Appellants argue that the "large attorneys' fees" awarded here somehow signal collusion. Putting aside the fact that the fees here are not large compared to the value of the benefit (or Class Counsels' lodestar) (discussed *infra* in Section III), no Appellant challenges the fact that no discussion of attorneys' fees or costs or compensation to Plaintiffs occurred prior to the agreement between Pella and Plaintiffs on the substantive terms of the Class benefit. The first negotiation of fees took place months after the Class benefit had been agreed to – in December 2011 – and under the auspices of an independent mediator, Judge Erwin Katz, retired. (R. 5773-74.) At the fee mediation, Class Counsel negotiated for a higher fee, and Pella negotiated for a lower fee. The $11 million fee agreement was reached as a result of

24

considerable compromise on both sides, and not the product of collusion in any way.[10]

### 3. The Settlement Creates No Conflict Among Class Members.

The Lang Group asserts that different quanta of recovery available to differently situated members of the Class somehow creates a conflict of interest, but this alleged conflict is not explained and is particularly puzzling given that (i) differences in relief among class members is normal in class action settlements; and (ii) this is not a Settlement where a common fund is created and different categories of class members are forced to compete against each other for a piece of the limited pie. There is no conflict here, and there was no need for sub-classing with separate representation.[11]

The Lang Group erroneously concludes that a single purportedly common circumstance among all Class Members—a defect in windows—must automatically yield identical relief to the entire Class, and that because the Settlement provides for different categories of relief for different Class members, sub-classing and separate representation are warranted. (App. D.E. 27-1 at 36.) This argument ignores the District Court's limited class certification order, which effectively required that a Settlement be structured to recognize that differing circumstances of Class members by necessity yield different categories of relief based on each Settlement Class member's individual facts, including age and number of windows.

---

[10] Mr. Lang, counsel for the Lang Group of objectors, has the temerity to argue that the "large" fees here signal collusion even though in his verified state court lawsuit, Lang alleged fees were too *low*. (R. 3848.)

[11] Mr. Lang did not make this argument to the District Court; it is therefore waived.

But these differences do not put Class members in conflict with each other. "[V]aried relief among class members with differing claims in class settlements is not unusual." *See In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 349 (3d Cir. 2010) ("It is not enough for objectors to point to differences in claims, allocation amounts, or state laws without identifying how such differences demonstrate a conflict of interest.").[12] Nor do differences in relief among class members based on the relative strength of a claim, or relative value of his or her claim, such as those present in this case create conflicts. *Id.* at 347. Appellants have thus failed to demonstrate a conflict, let alone one that is "fundamental [that goes] to the heart of the litigation." *Gunnells v. Healthplan Services, Inc.*, 348 F.3d 417, 431 (4th Cir. 2003)(citations omitted). A conflict is "fundamental" "where some party members claim to have been harmed by the same conduct that benefitted other members of the class." *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). That situation is not present here, as no form of relief for one category of claimants is diminished by the other. "Conflicts between class members based on their respective relationships to the defendant are relevant only when the class

---

[12] The cases the Objectors cite do not alter this conclusion. In *dicta*, this Court in *Reynolds*, 288 F.3d at 279, simply made a comment about "an unremarked conflict," that did not rise to the level of presenting an impermissible conflict. *Smith v. Sprint Communications Co., L.P.,* 387 F.3d 612 (7th Cir. 2004) is inapplicable because that case involved representative plaintiffs who had previously been class representatives in state class actions certified for litigation purposes who later attempted to certify a national settlement against the defendant on different terms. *Mirfasihi v. Fleet Mortg. Corp*, 450 F.3d 745 (7th Cir.2006) simply overturned the lower court's decision because of a failure to discuss the value of the settlement, when the proposed settlement would have extinguished 1.4 million claims at no cost to the defendant. *Id.* at 785.

representatives' economic interests and objectives *substantially* conflict with those of absent class members." *Allen v. Holiday Universal*, 249 F.R.D. 166, 182 (E.D. Pa. 2008). The differing forms of relief (as indicated above) are rationally tied to the differing values of each Class member's claim and their circumstances. Named Plaintiffs' are not in competition with other Settlement Class members over the relief they claim. Sub-classes with separate counsel were not warranted.

### 4. There Is No Conflict of Interest Created By Differences In State Consumer Fraud Laws.

The Lang Group argues the nationwide settlement creates "unaccounted-for conflicts of interest based on variations in state consumer fraud laws." (App. D.E. 27-1 at 37.)[13] But curiously, they actually fail to identify a single such instance, and even where such a "conflict" has been specifically identified, it has been rejected by the courts. *See In re Uponor, Inc.,* 2013 WL 2450138, at *2 (8th Cir. June 7, 2013) (rejecting argument that nationwide settlement failed to account for broader relief that might have been available to California residents under the California Right of Repair Act).

The Lang Group also circularly argues that Class Counsel were "disarmed" in negotiations by these alleged differences. Here, they actually try to use the fact that the Class was not certified for damages purposes as evidence of collusion. But wholly unlike the authority Lang cites,[14] the District Court certified, and this Court

---

[13] Lang did not make this argument to the District Court: it has therefore been waived.

[14] In *Smith v. Sprint Commc'ns Co., L.P.*, 387 F.3d 612 (7th Cir. 2004), this Court vacated certification of a nationwide settlement class because the class

affirmed, a single 50-state 23(b)(2) class and a six-state 23(b)(3) class. Class Counsel were not "disarmed" by this finding, they were emboldened and enabled to reach this Settlement. Of course, the Settlement had to account for the limited nature of certification, but this is a reason to laud the Settlement, not condemn it. It also must be noted that the position that Class Counsel was "disarmed" by the fact that "everyone knew [Class Counsel] could not certify [the 23(b)(3) classes] for litigation purposes due to variations in state consumer fraud laws" is wholly at odds with the claims of the Lang Group that this case was worth over $300 million in any realistic sense. (App. D.E. 27-1 at 38.)

Further, the issue of alleged "conflicts" among state laws was litigated fully below, and the District Court did not conclude that such conflicts existed. To the contrary, the exclusion of causation and damages from the certified classes was based on individual issues of evidence and not differences in state laws. (*See* R. 2933-39.)

---

representatives did not adequately represent the interests of certain class members. Essential to this determination was the fact that the district court had enjoined "two groups [of class members who] have already been certified as litigation classes in their respective states, and each was on the eve of trial". *Id.* at 614. The class counsel were found to have negotiated from a "disarmed" state because they did not, and arguably could not, have a nationwide class certified for trial while the intervenors/objectors had already had their classes certified for trial that was imminent. In addition, one of the enjoined classes "established liability in state court for the taking of their property, and estimate compensatory damages at approximately ten times greater than the upper limit provided by the proposed nationwide settlement. They have also shown that punitive damages may be available for trespass to their property, subject to proof at trial." *Id.* (citations omitted). Here, there is no evidence that any Class member's interest is not adequately represented, there is no other certified class, there is no case on the eve of trial being enjoined, there has been no independent establishment of liability, and no proof of greater compensatory damages or availability of punitive damages.

### 5. The District Court Did Not Abuse Its Discretion in Finding That Class Representative Saltzman Is Adequate Under Rule 23.

Rule 23(a)(4) requires that the named class representatives "fairly and adequately protect the interests of the class." Appellants each argue that the District Court abused its discretion by finding Dr. Saltzman to be an adequate representative of the Settlement Classes because he is the father-in-law of one of the attorneys of Class Counsel firm CLG. Appellants' arguments are in error for two reasons: (1) there is no *per se* rule preventing a family member from serving as a class representative, and here Dr. Saltzman was plainly adequate as he was the sole plaintiff who initiated this lawsuit, and has served as a Class Representative for six years; and (2) the presence of four other named class representatives renders Dr. Saltzman's status irrelevant.

### a. The District Court Did Not Abuse Its Discretion in Finding Dr. Saltzman To Be an Adequate Class Representative Under the Case-by-Case Standard Enunciated in *Susman*.

Appellants rely on this Court's decision in *Susman v. Lincoln Am. Corp.*, 561 F.2d 86 (7th Cir. 1977), asserting that it mandates removing Dr. Saltzman as a class representative. But while *Susman* certainly suggests that such relationships require careful scrutiny, "[t]he determination of inadequacy based on close relationships is on a case-by-case basis." *In re Yasmin and Yaz Marketing Litigation*, 2012 W.L. 865041 at *17 (S.D. Ill. Mar. 13, 2012) (citing *Susman*). Indeed, *Susman* is clear in stating that "we have not yet ruled on whether, as appellee suggests here, there should be a per se rule prohibiting the practice." 561 F.2d at 90. *Compare Malchman v. Davis*, 761 F.2d 893 (2d Cir. 1985) *cert. denied,* –

– U.S. —, (1986) (brother of class counsel approved as class representative); *Lewis v. Goldsmith,* 95 F.R.D. 15 (D.N.J. 1982) (class representative represented by uncle's law firm approved); *Fischer v. ITT Corp.,* 72 F.R.D. 170 (E.D.N.Y. 1976) (father of the class attorney approved). Under the facts of this case, the District Court was within its discretion to find Dr. Saltzman an adequate representative despite his familial relationship.[15]

First, Appellants point to nothing other than the theoretical possibility Dr. Saltzman was improperly influenced. But if that theoretical possibility were itself a sufficient showing, *Susman* would have adopted a *per se* rule. But it did not. And it is telling, given Mr. Lang had been Dr. Saltzman's lawyer in this case, that he has been unable to come up with any evidence.[16] Appellants' arguments are simply suppositions of the worst kind that impugn Dr. Saltzman's integrity.

Second, the District Court was presented with evidence that rebutted the theoretical possibility upon which Appellants exclusively rely. Appellants do not address this evidence, and this evidence precludes the possibility that "no reasonable person" would have found Dr. Saltzman to be an adequate class

---

[15] Of course Dr. Saltzman was previously found to be an adequate representative when the District Court certified the case on a contested basis in 2009, which ruling was affirmed by this Court in 2010.

[16] It cannot go unnoted that Mr. Lang, one of the attorneys calling Dr. Saltzman inadequate, has a gross conflict of interest in that he had been Dr. Saltzman's lawyer prior to being fired by Class Counsel firm Complex Litigation Group LLC. A lawyer asking that his former client in the very same case be disqualified as a class representative is the archetype of a conflict of interest. It is also notable that even though Mr. Lang had significant contact with Dr. Saltzman, he can point to nothing Dr. Saltzman said or did that suggests his support of the Settlement was the result of his family relationship.

representative:

- Four other Class Representatives appointed by the District Court support the Settlement, so disqualifying Dr. Saltzman would not alter the outcome;

- The Settlement was negotiated and supported by an impressive array of Class Counsel law firms (other than CLG);

- Dr. Saltzman is the one who brought this case to his son-in-law's law firm, not vice-versa;

- Dr. Saltzman actively participated in discovery, including opening his home for lengthy and intrusive inspections, has produced documents, sat for deposition, and actively consulted with Class Counsel on the status of the litigation and the pending settlement; and

- Dr. Saltzman has been found to be an adequate class representative in other litigation where his son-in-law's law firm was not involved. *Cf. Saltzman v. ESBI*, 348 Ill. App. 3d 740 (Ill. App. Ct. 2004).

Dr. Saltzman is a sophisticated class representative who has repeatedly demonstrated his mastery of the issues in this litigation. He has been actively engaged throughout, and his adequacy is beyond reproach.[17]

---

[17] Objectors also erroneously argue that Pella's early "pick off" settlement offer was superior to the benefits of the Settlement, and that therefore Dr. Saltzman's rejection of that offer must mean that the current Settlement is inadequate. It must first be noted that Mr. Lang only knew about the prior offer because he was one of Dr. Saltzman's counsel at the time. His use of this information to try to remove his own former client is a gross conflict of interest. What compounds Mr. Lang's problem is that he is factually wrong. What Mr. Lang does have right is the fact that Dr. Saltzman rejected Pella's effort to "pick him off" very early in the case by offering him the PSEP benefits – an offer made before the case had gotten off the ground and before anyone knew of the risks of continued litigation. Lang is just wrong on the value of what Dr. Saltzman was offered in comparison to what he can receive through the settlement. Dr. Saltzman is not limited to $750 through the Settlement as he has filed a claim for the arbitration procedure wherein he could

### b. The Presence of Other Class Representatives Makes Dr. Saltzman's Adequacy Immaterial.

Appellants have little to say about the four additional Class Representatives on the Third Amended Complaint except complaining that they know little about these representatives.  Of course, this statement disingenuously ignores that the Lang Group subpoenaed these Class Representatives for a deposition and then withdrew the subpoena, which suggest they were not that serious in wanting to know more about them.  Further, there is a good reason for that lack of seriousness: these additional Class Representatives were not unknown to Mr. Lang.  Each of these individuals had been a client of CLG for a long period of time before their names appeared on an amended complaint, and Mr. Lang, in his role as an employee of CLG, had spoken and worked previously with these persons.  Indeed, Mr. Lang *himself* prepared a Second Amended Class Complaint for which leave to file was sought on October 28, 2011 and in which current class representatives Mr. Bastiaanse and Mr. Palmiotto were listed as class representatives.  (R. 3794-3825.) Thus, contrary to the suggestion, these representatives did not just suddenly pop up on the settlement complaint for purposes of replacing the Lang Group, and the new representatives are not strangers to at least Mr. Lang who used to be their lawyer.

All Rule 23 requires is a single adequate class representative, and Appellants have failed to show that Judge Zagel's decision to find the non-Saltzman Class

---

receive as much as $6000.  Further, even if Dr. Saltzman had chosen the non-arbitration procedure, the early Pella settlement offer was still less than what he could receive under the Class Settlement as, in addition to the $750, he could have received "benefits under the agreed scope of the ProLine Service Enhancement Program, as described below."  (R. 4217-18.)

Representatives to be adequate was so wrong that no reasonable person could have agreed. The presence of these other representatives made the District Court's decision about Dr. Saltzman one that does not impact the substantive Rule 23 determination because "[w]here there is more than one named representative, it is not necessary that all the representatives satisfy the requirement". *Brown v. LaSalle Northwest Nat'l Bank*, 1993 WL 313563, at *5 (N.D. Ill. Aug. 17, 1993). *See also Local Joint Exec. Bd. Of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.,* 244 F.3d 1152, 1162 n.3 (9th Cir. 2001) ("Because the adequacy of representation requirement is satisfied as long as one of the class representatives is [] adequate [], we do not address the adequacy of Byford"); *Sobel v. Hertz Corp.*, 2013 WL 1182209, at *15 (D. Nev. Mar. 21, 2013) (declining to resolve challenge to representative with close business relationship to class counsel because another plaintiff "is an adequate representative even if he is not."); *Calabrese v. CSC Holdings, Inc.*, 2009 WL 425879, at *21 (E.D.N.Y. Feb. 19, 2009) ("[E]ven if several of the named plaintiffs cannot function as adequate class representatives, it remains true that at least two of them can."); *Humphrey v. Int'l Paper, Inc.*, 2003 WL 22111093, at *19 (N.D. Ill. Sept. 11, 2003) ("[T]he absence of Messrs. Percy Jones and Baxter as class representatives ... would still leave eight named plaintiffs"). That all these other district courts took this approach undermines any claim that no reasonable person could have agreed with the District Court's decision here.

### 6. Class Counsel Meet the Requirements for Adequacy And Has No Conflicts of Interest.

This is a case with several experienced Class Counsel law firms. Nonetheless, Appellants argue that alleged conflicts of interest with one lawyer at one such law firm requires reversal. The arguments are without merit. The challenge to Mr. Weiss based on his issues with the Illinois disciplinary authorities over allegations of sexual harassment is irrelevant to the adequacy of Mr. Weiss in representing the Class, and completely ignores that he is just one lawyer at one of the Class Counsel law firms, as well as the presence of the other Class Counsel law firms who were intimately involved with all aspects of the Settlement and whose adequacy has not been challenged.[18] The allegation that the Class was "sold out" by Mr. Weiss' firm because it "needed money" ignores the numerous other law firms involved in the settlement who are not alleged to have similar issues. In particular, Jonathan Shub of Class Counsel Seeger Weiss, was involved in every mediation and negotiation leading to the Settlement. Of course, Appellants' argument is dependent on whether in fact the Class has been sold out, and there is certainly no evidence of that here.

Every step of the negotiations was placed before two competent mediators, supported by exhaustive analysis and hard-nosed advocacy on both sides. Ample evidence was provided to the District Court rebutting the self-serving and unsubstantiated allegations made by Mr. Lang below that Paul Weiss and Richard Burke put their own interests before those of the Class because they "needed money

---

[18] Though those charges have been pending since 2007, CLG has been appointed Rule 23(g) lead or co-lead counsel in dozens of cases since then.

to start a new firm," not the least of which is simple logic:  no class action law firm could solve an alleged short-term need for cash by settling a class action lawsuit on the cheap, given how long settlements take to be approved and paid.  Indeed, Appellants argue that CLG sold out the Class at the fee mediation in late 2011 because of this purported immediate need for money.  Yet now, in September 2013, CLG still has not received a single penny in this Settlement, and CLG continues to operate functionally as a law firm and as lead or co-lead counsel in numerous other federal and state court class actions.

Indeed, CLG and the other Class Counsel did not even mediate the attorneys' fee issue until three months after the Class benefit was agreed to in writing.  This timeline is utterly inconsistent with the notion of a law firm needing to settle a case quickly for cash.

Finally, the sole source of this calumny was the word of Mr. Lang, who testified before Judge Zagel, and Judge Zagel did not believe Mr. Lang's uncorroborated testimony.  Indeed, Mr. Lang had ample motive to lie given that he had been fired by CLG and had filed a motion to try and hijack the case from CLG.  Lang's accusations say far more about Mr. Lang than they do about anyone else.

### 7. The Class Representative Fees Here Were Modest and Reasonable In Light of the Services Performed.

Appellant Schulz, represented by Professional Objector Christopher Bandas, advances an argument never made to the District Court:  that "paying class representatives to support a settlement creates a Rule 23(a)(4) conflict as a matter of law."  [App. D.E. 26 at 13]  This argument is waived.  It is also wrong.

Class representative incentive fees are a routine and desirable part of a class action settlement. This Court in *Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 876-77 (7th Cir. 2012) noted the numerous salutary benefits of such incentive payments and noted that a 2006 study of over 300 class actions found a median award of $4000.

The question is thus whether there was anything wrong with the specific incentive payments in this case, and the answer is no. All of the class representatives on the original complaint, including Dr. Saltzman, were awarded $10,000 as recognition for the significant amount of work they did on behalf of the Class which exceeded the norm.[19] They were not only deposed but their homes had to undergo detailed inspections, provide more than the usual amount of documentation in discovery, and had numerous interactions with counsel. That all class representatives were offered the incentive award,[20] regardless of their support of the Settlement, is proof that no one was "paid" to support the Settlement.[21]

---

[19] Class Counsel sought to ensure that even the Lang Group of objectors received the $10,000 incentive payment. At the final approval hearing, Class Counsel suggested they receive such an award. Mr. Lang stated on the record that they wished to receive the award, made an 'oral motion' for such an award, but filed no pleading in spite of telling Judge Zagel that he would. (R. 6835-36.) As such, no application of the incentive award has been filed. One wonders whether Mr. Lang's "clients" are aware that he has not pursued their incentive payment to advance his, rather than their, goals.

[20] The new class representatives on the Third Amended Complaint were offered a smaller incentive award of $5000 which reflected the fact that they had not been deposed. This award is modest and barely above the median and is unlike *In re Dry Max Pampers Litigation*, 2013 WL 3957060 (6th Cir. Aug. 2, 2013) which Schulz cites because in *Pampers* the class received no payment and the representatives received a $5000 award.

[21] Schulz/Bandas rely solely on *Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157

### 8. The "Clear Sailing" Provision In the Settlement Is Not An Indication of Collusion.

Appellant Schulz asserts that presence of a "clear sailing" provision wherein Pella promised not to challenge Class Counsel's attorneys' fee request requires the Settlement be rejected. But that is simply not the law, and the argument ignores uncontested facts which, even under a "heightened scrutiny" approach, demonstrated the absence of collusion.

The law (in the Ninth Circuit only at this point in time) concerning Clear Sailing provisions merely suggests that the presence of such a clause is an occasion to enhance the scrutiny of the award. That certainly occurred at the District Court, where all Appellants objected to some aspect of the fee and asserted, without evidence, that it was the product of collusion. Class Counsel submitted the affidavit of Judge Katz who mediated the fee settlement and stated there was no collusion. Further, Pella is paying the fee here directly from its own pocket. The mediated settlement agreement signed by Pella would have no meaning if Pella could turn around and challenge the very fee it agreed to pay through a negotiated mediation.

Likewise, Clear Sailing provisions simply do not lead to the rejection of an attorneys' fee request, and given the unrebutted evidence above, the District Court did not abuse its discretion in being apparently untroubled by the Clear Sailing

---

(9th Cir. 2013) where the receipt of the incentive fee was conditioned on supporting the settlement. There was no such condition here and unlike in *Experian* the objecting class representatives were explicitly brought into the incentive payment fold on the record. Further, Class Counsel were not allowed to have interactions with the Lang Group because they were represented by Mr. Lang and therefore could not have communicated to them using the incentive payment as a means of securing their support for the settlement.

provision. *Compare Hartless v. Clorox Co.*, 273 F.R.D. 630, 646 n.6 (S.D. Cal. 2011)

("clear sailing agreements are routinely accepted"); *In re Oil Spill by Oil Rig*

*Deepwater Horizon*, 2013 WL 144042, at *25 (E.D. La. Jan. 11, 2013) (noting that

"numerous cases ... have approved agreements containing such clear-sailing

clauses."); *McKinnie v. JP Morgan Chase Bank, N.A.,* 678 F. Supp. 2d 806, 812

(E.D. Wis. 2009) ("fact that the proposed settlement includes [clear sailing] terms

does not render it inherently unfair or unreasonable.").

### D. The Stage of the Proceedings and Amount of Discovery Completed When Settlement was Achieved

No Appellant argues that the case was settled before Class Counsel was fully

informed of the facts and risks of proceeding further. The Settlement came after six

years of vigorous litigation including depositions, document reviews, expert testing,

motions to dismiss, class certification, and appeals in the Seventh Circuit and the

United States Supreme Court.

The stage of the proceedings allowed Class Counsel to be fully informed of the

facts as well as the risks and rewards of continuing to litigate. Class Counsel

emphatically support the Settlement – a view that is given great deference in light

of the stage of the proceedings. *See In re Cendant Corp. Secs. Litig.*, 109 F. Supp.

2d 235, 255 (D.N.J. 2000) ("Significant weight should be attributed to the belief of

experienced counsel that settlement is in the best interest of the class.") (citation

and internal quotation marks omitted); *In re RJR Nabisco, Inc. Secs. Litig.*, 1992

WL 210138, at *4, (S.D.N.Y. Aug. 24, 1992) (court "should give deference, when

considering the fairness of the proposed settlement, to the judgment of experienced

class counsel").

## II. THE DISTRICT COURT'S AWARD OF ATTORNEYS' FEES WAS NOT AN ABUSE OF DISCRETION.

All Appellants in one form or another challenge Class Counsel's fee. Their challenges are factually in error, in contravention of settled law, and fail to demonstrate that the District Court acted outside its discretion.

Courts in this Circuit evaluate the reasonableness of a class counsel's petition for fees using either the "percentage of recovery" or "lodestar" approach. *See Florin v. NationsBank of Ga., N.A.*, 60 F.3d 1245, 1247, n.2 (7th Cir. 1995) ("*Florin II*"). The district court's task was to do its "best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market" at the outset of the litigation when the risk of loss still existed. *Sutton v. Bernard,* 504 F.3d 688, 692 (7th Cir. 2007). Further, "[c]ourts have relied on 'common fund' principles and the inherent management powers of the court to award fees to lead counsel that do not actually generate a common fund." *In Re GM Pick Up Truck*, 55 F.3d 768, 821 (3rd Cir. 1995). The District Court did just as instructed and did not abuse its discretion.

### A. The District Court's Attorneys' Fee Award Was Within Its Discretion Under the Common Benefit Approach.

#### 1. The Attorneys' Fees Are Low in Comparison to the Benefit.

Appellants' argument that a "warning sign" exists based on the size of the attorneys' fees is baseless. The District Court concluded the Settlement would yield a $90 million value to the Class – a number which did not include the substantial

value of the PSEP benefits already paid by Pella.  Even without considering the PSEP benefits, the fee awarded is 12% of the value of the Settlement, well within an acceptable range in percentage of benefit cases.

It was reasonable to apply the common benefit approach given that the Settlement was capable of being valued such that a percentage can be determined. *In Re GM Pick Up Truck*, 55 F.3d 768.[22]   Fees of 30% or more are regularly approved in this Circuit, and the fee here is well less than such awards.  *Compare Taubenfeld v. AON Corp.*, 415 F.3d 597, 600 (7th Cir. 2005) (approved 30% and took note of table of thirteen cases in the Northern District of Illinois where counsel was awarded fees amounting to 30-39% of the settlement fund).  The percent of the common benefit awarded is low, and hardly signifies a "warning sign."

### 2. The Court Was Within Its Discretion to Award Fees Based on the Valuation and Not to Use Claims Filed as the Valuation Basis.

Certain Appellants argue that, because this is a claims made settlement and not a common fund in the traditional sense, fees should be based only on the value of the claims paid.  But there is no law mandating such an approach and such an approach is contrary to the law when cash is part of the settlement benefit.  As the Supreme Court has explained, "[t]o claim their logically ascertainable shares of the

---

[22] Class Counsel notes that Pella has valued the settlement at a different number. Class Counsel believed that Pella's valuation was in error and so explained that to the District Court.  Specifically, the District Court was told that in Class Counsel's regression of Pella R&A data, the data suggested that warranty claims for wood rot greatly increased under the PSEP because Pella acknowledged wood rot as a warrantable defect beginning only in 2006, with the initiation of the PSEP and not before.  Therefore, in considering the likelihood for window failure, the proper data to regress was the subset of 1999 to 2002 PSEP data rather than the full 20 years of R&A data that Pella had regressed.  (R. 5342-44.)

judgment fund, absentee class members need prove only their membership in the injured class. ***Their right to share the harvest of the lawsuit upon proof of their identity, whether or not they exercise it, is a benefit*** to the fund created by the efforts of class representatives and their counsel." *Boeing v. Van Gemert*, 444 U.S. 472, 479-80 (1980) (emphasis added); s*ee also Williams v. MGM–Pathe Commun. Co.,* 129 F.3d 1026 (9th Cir. 1997) (reversing award of 33% of claims paid and awarding 33% of available fund); *Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423 (2d Cir. 2007) (abuse of discretion basing fees on claims made); *In re Kentucky Grilled Chicken Coupon Marketing & Sales Practices Litigation*, 280 F.R.D. 364, 380  (N.D. Il. 2010); *McKinnie v. JP Morgan Chase Bank, N.A.,* 678 F. Supp. 2d 806, 815 (E.D. Wis. 2009) (awarding 33% of available fund, which exceeded the amount claimed, because "settlement amount was available to the entire class").

However, even under a "claims paid" approach, Class Counsels' fee is justified.  As the updated claims statistics presented to the District Court indicate (*see* Rasch declaration attached hereto as SA171-172), the 23(b)(3) class members can receive up to $16,933,500 in cash benefits.[23]  In addition to the 23(b)(3) class, no Appellant attacks the future value number of over $47,000,000 that the Class will derive through 2021 in the form of the extended and PSEP enhanced warranty (indeed, the Appellants all contend the defect is a widespread problem, so they take no issue with the 13% failure rate assumption in the valuation).  Class Plaintiffs' valuation expert separately valued each component of the Settlement, including the

---

[23] This is simple math multiplying the number of non-arbitration claims filed times $750 and the number of arbitration claims filed times $6000.

component for "future damages". (R 5816-5842.)  It is important to note that the Settlement extended PSEP benefit for the costs of installation and finishing to window vintages 2004-06 (at a failure rate of 13% equates to 223,027 windows; R. 5842).  Just adding together the cash value of the claims made and the future relief yields a Class benefit of $63,933,500, putting the $11 million fee at 17.2% of the value.

But even this valuation is low, as the additional amounts paid by Pella for notice and administration[24] and for attorneys' fees, costs and incentive fees[25] should be added to the total class benefit for purposes of calculating attorneys' fees.  Here, the total costs of Class notice and administration (both amounts actually incurred to date and those reasonable amounts anticipated in the future due to the continuing claims process) are in excess of $1 million.  Likewise, Pella has agreed to pay directly

---

[24] *See, e.g., Mangone v. First USA Bank*, 206 F.R.D. 222, 225-228 (S.D. Ill. 2001) ("Defendants paid the costs of [notice], administering the Settlement ..., and attorney's fees, all of which, in the event the case was fully litigated and the Class prevailed, would have been deducted from the Class recovery ...."); *Physicians of Winter Haven LLC v. Steris Corp.*, 2012 WL 406966, at *7 (N.D. Ohio Feb. 6, 2012) (where defendant pays for notice, "this, too, represents a benefit to the class and must, therefore, be included in the total common benefit amount used to calculate a percentage of the fund award of attorneys' fees"); *Staton v. Boeing Co.*, 327 F.3d 938, 975 (9th Cir. 2003).

[25] *See Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 246 (8th Cir. 1996) ("Even if the fees are paid directly to the attorneys, those fees are still best viewed as an aspect of the class' recovery."); *Physicians of Winter Haven*, 2012 WL 406966, at *7 ("[T]he overall settlement amount on which the percentage is to be calculated must include the amount separately set aside for attorneys' fees since ... [it] is a benefit to the class."') (citations omitted); *In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at *9 (D.D.C. July 16, 2001) ("in constructive common fund cases, where attorneys' fees are borne by defendants and not plaintiffs, ... the attorneys' fees nonetheless are a valuable part of the settlement and thus fairly characterized as part of the common fund.").

the attorneys' fees, costs and incentive fees with a total value of $11 million. These two additional benefits of the Settlement, added to the total direct benefits described above, substantially increase the total class benefit to $75,933,500, making the fee awarded 14.5% of the value.

### B. The District Court Did Not Abuse its Discretion Even if the Fee Award Was Judged Under the Lodestar Method.

No Appellant asserts that Class Counsel's fee was an abuse of discretion under the lodestar method. No Appellant challenges the reasonableness of the number of hours Class Counsel expended in battling Pella or the sufficiency of the records detailing that expenditure of effort that were provided to the District Court.

Class Counsel expended tremendous effort in bringing about this Settlement on behalf of thousands of Pella Class members. Pella's able defense team fought Class Counsel at every stage. From pre-complaint investigation through settlement, including protracted discovery, numerous briefs, and trips to this Court and the Supreme Court, in over six years of litigation, the total lodestar expended by Class Counsel was $9,155,566.20. The $11 million fee awarded represents a modest multiplier of less than 1.2, which is well in-line with existing precedent. *See In re Cenco, Inc. Sec. Litig.*, 519 F. Supp. 322 (N.D. Ill. 1981) (applying lodestar multiplier of 4 to lead counsel's lodestar and 2 to other counsels' lodestar); *Florin II*, 60 F.3d at 1247 (finding 1.01 multiplier abuse of discretion and directing district court to award 1.53 multiplier).[26]

---

[26] Appellant Pickering argues that a lodestar multiplier is barred by *Perdue v. Kenny A.*, – U.S. –, 130 S. Ct. 1662 (2010). *Perdue* is inapposite as it merely

But the District Court was well aware that Class Counsel's work in this case would not end at final approval and the modest multiplier would probably become lodestar negative when the work on the inevitable appeals and the future efforts Class Counsel will be required to expend given the structure of the Settlement are factored in. (Currently Class Counsel interact with class members on a daily basis, answering settlement related questions and concerns, and will continue their efforts to monitor and administer the Settlement for years to come because the Settlement remains open until 2021.)

### C. Class Counsel's Request For Attorneys' Fees Compares Favorably With Other Home Product Settlements.

The District Court was also presented with evidence of fee awards in other window and "home products" cases, and none of the Appellants argue that the fee here is overly generous to Class Counsel compared to these other settlements. *Compare Taubenfeld v. AON Corp.*, 415 F.3d 597, 600 (7th Cir. 2005) ("attorneys' fees from analogous class action settlements are indicative of a rational relationship between the record in this similar case and the fees awarded by the district court.").

*Cartwright v. Viking Indust., Inc.*, No. 07-cv-2159 (E.D. Cal. May 5, 2010), a defective window class settlement where Pella was an interested party (Pella bought Viking in 1998), demonstrates both the excellence of the settlement reached

---

continued the decision arc of *City of Burlington v. Dague*, 505 U.S. 557 (1992), in which the Supreme Court eliminated lodestar multipliers, except in exceptional circumstances, for fee awards under federal fee-shifting statutes. *See Perdue*, 130 S. Ct. at 1676. This Court has explicitly restricted *Dague* as applying only to statutory fee-shifting cases, as the reasoning of *Dague* is largely based on the statutory language of federal fee-shifting provisions not present in Rule 23 fee petitions. *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 564 (7th Cir. 1994).

here as well as the reasonableness of the fee. The *Viking* settlement was a claims-made, California-only, agreement with a hard cap of $500.00 per structure, and no arbitration opportunity to go over the cap was provided. Viking paid attorneys' fees of approximately $4.1 million for this settlement that just benefitted California residents. In comparison, the benefits to the Class achieved here (a $750 cap, or a $6,000 cap in Arbitration) are much greater, and *Viking* only settled a single state whereas this Settlement brings relief to the entire country. And, the plaintiffs in *Viking* had a stronger liability case because the windows at issue in *Viking* were sold with a sticker on each window stating that the windows were under a lifetime warranty. In this case, the Settlement benefits exceed the original warranty benefits both in terms of the monetary benefits provided and the length of the warranty. *See also Galanti v. The Goodyear Tire & Rubber Co.*, No. 03-209 (D.N.J. Nov. 17, 2004) (attorneys in settlement over defective hoses awarded 30% of the $300 million settlement fund whereas here, the attorneys' fees are to be paid by Pella and not the Class and the percent of the benefit is well below the 30% awarded in *Galanti*) (*see* order attached hereto as SA173-182).

### D. Other Considerations Support the District Court's Discretion in Awarding the Attorneys Fees.

There are several other powerful considerations establishing the reasonableness of the awarded attorneys' fees. First, there is no ultimate cap on the Settlement. Thus, each Settlement Class member who participates in the Settlement will get the full settlement value of their claim, regardless of how many claims are filed.

Second, the entire amount of attorneys' fees, costs of notice, administration, litigation expenses, and other costs will be *paid separately* from the Settlement Fund and therefore do not diminish the value of the settlement to the Settlement Class. Thus, Class Counsel are not profiting at the expense of the Settlement Class.[27]

Third, Class Counsel achieved ground-breaking precedent in this litigation. It is noteworthy that other courts have taken notice of the results counsel achieved in *Pella. See Marshall v. H & R Block Tax Services Inc.*, 270 F.R.D. 400, 407 (S.D. Ill. 2010) ("The Court notes that the only multi-state consumer class certified by a district court and thereafter affirmed by the Seventh Circuit since the appellate court's decisions in the line of cases detailed above is *Saltzman v. Pella Corp.*"). *See also In re Zurn Pex Plumbing Products Liab. Litig.*, 644 F.3d 604, 617 (8th Cir. 2011); *Cruz v. Hook-Superx, LLC*, 2010 WL 3069558 (S.D. N.Y. Aug. 5, 2010); *Woodard v. Andrus*, 272 F.R.D. 185, 199 (W.D. La. 2010).

### E. The "Kickforward" Is Not Only a Common Feature of Class Settlements, it is Beneficial to the Class, And It Has Not Been Exercised.

Appellants object to the provision in the Settlement which provides that, only after final approval, Class Counsel shall have the right to take an advance of up to $2,000,000 of their awarded fee provided that Class Counsel agrees to return the

---

[27] Appellant Schulz argues that the "kicker" is a sign of self-dealing. As Pella's brief points out, this is not a common fund settlement; thus any reduction in attorneys' fees must return to Pella as the party that was directly paying the fees separate from the Class benefit. As set forth above, Class Counsel opted against a common fund because the Settlement does not cap the total dollar amount available to pay all Class member's claims nor will any Class member's claim per reduced *pro rata* by the claims of other Class members.

monies should the settlement be overturned on appeal.  (R. 4239-42; 4246.)
Appellants label this provision a "kickforward" payment to Class Counsel and insist
it is some sort of warning sign.  But this benign provision poses no such concerns.

Appellants complain that such a provision would make it harder for objectors
to appeal an approved settlement.  But this provision would not raise the costs of an
objector appealing.  To the contrary, it serves the beneficial purpose of deterring the
form of "greenmail" that professional objectors practice when they seek a cash
payment to dismiss their appeal predicated on unlocking attorneys' fees held in
abeyance during an appeal.

Nor is there anything to the claim that Pella is advancing the funds to
preserve and protect its own interest in the Settlement.  Class Counsel, and not
Pella, sought this provision, explicitly because it would assist in deterring
greenmail (it obviously did not work here, although no greenmail was nor will be
paid).  There is simply no evidence presented by any Appellant that Class Counsel
is somehow being bribed into this settlement by the "kickforward," and the
$2,000,000, if drawn upon, would have had to have been supported by a letter of
credit so that Pella retained its ability to recover the money in the event of reversal.
To be sure, Class Counsel has not exercised this right to receive any part of the $2
million potential advanced.

Appellants also contend that such a fee advance is "unprecedented", despite
their counsel's own participation in numerous settlements where the entire fee was
paid before any appeal was taken (what is commonly known as a "quick pay").

47

Indeed, Objectors fail to cite a single case where such a provision has been disapproved or even where a court has suggested there is any impropriety. To the contrary, in this unfortunate age of "professional objectors," such provisions are routinely contained in class settlement agreements because they act as a disincentive to such unseemly "blackmail" litigation tactics. *See, e.g.*, *Vaughn v. Am. Honda Motor Co., Inc.*, 507 F.3d 295, 300 (5th Cir. 2007) ("In some circumstances objectors may use an appeal as a means of leveraging compensation for themselves or their counsel."); Fitzpatrick, The End of Objector Blackmail?, 62 VANDERBILT L. REV. 1623, 1643 (2008).

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment of the District Court. In the event this Court determines that a remand is necessary, Judge Zagel should be given an opportunity to further explain his findings of fact and conclusions of law.

DATED: September 10, 2013    Respectfully submitted,

**DR. LEONARD E. SALTZMAN, TIM BASTIAANSE, JOSEPH PALMIOTTO, BRAD ZURN, and JUDITH MCCLOSKY, Class Plaintiffs,**

  /s/ Richard J. Burke
Richard J. Burke
Paul M. Weiss
Jeffrey A. Leon
**COMPLEX LITIGATION GROUP LLC**
513 Central Avenue, Suite 300
Highland Park, IL 60035
(847) 433-4500

48

rich@complexlitgroup.com
paul@complexlitgroup.com
jeff@complexlitgroup.com

Jonathan Shub
**SEEGER WEISS LLP**
1515 Market St., Suite 1380
Philadelphia, PA  19102
(215) 564-2300
jshub@seegerweiss.com

Steven R. Jaffe
Mark Fistos
**FARMER JAFFE, WEISSING, EDWARDS,
FISTOS & LEHRMAN, P.L.**
425 North Andrews Ave., Suite 2
Ft. Lauderdale, FL 33301
(954) 524-2820
steve@pathtojustice.com
mark@pathtojustice.com

Ben Schwartzman
**BANDUCCI WOODARD SCHWARTZMAN
PLLC**
802 W. Bannock Street, Suite 500
Boise, Idaho 83702
(208) 342-4411
BScwartzman@BWSlawgroup.com

*Attorneys for Plaintiffs and Settlement Class*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,982 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionately spaced typeface using Microsoft Word in Century type style, font size 12.


Dated: September 10, 2013                    /s/ Richard J. Burke

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2013, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


    /s/ Richard J. Burke